NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

|  |  |  |
|---|---|---|
| RESCUE MISSION OF EL PASO, INC. individually, and on behalf of all others similarly situated, | : : : : | **OPINION** |
| Plaintiffs, | : : | Civ. No. 12-cv-00509 (WHW) |
| v. | : : | |
| K-SEA TRANSPORTATION PARTNERS L.P. et al., | : : : | |
| Defendants. | : | |

---

**Walls, Senior District Judge**

Plaintiffs Rescue Mission of El Paso, Inc., Blake Barrow, and George Boutro are purchasers of K-Sea Transportation Partners L.P.'s publicly traded securities between May 1, 2009 through January 27, 2010 ("Class Period"). Am. Compl. ¶ 1. They bring a class action which alleges violations of Sections 10(b) of the Securities Exchange Act of 1934 ("the Securities Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b-5 promulgated by the Securities Exchange Commission, 17 C.F.R. § 240.10b-5, and Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a). *Id.* Defendants K-Sea Transportation Partners, L.P., K-Sea General Partner, L.P., K-Sea General Partner GP, LLC, Kirby Corporation, Timothy J. Casey, Thomas M. Sullivan, Terrence P. Gill, and Richard P. Falcinelli ("K-Sea Defendants") move to dismiss this case pursuant to the Private Securities Reform Act of 1995 ("PSLRA") and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. Defendants Anthony S. Abbate, Barry J. Alberin, James J. Dowling, Brian P. Friedman, and Frank Salerno ("Director Defendants") also

move separately to dismiss this case pursuant to the PSLRA, Rules 9(b) and 12(b)(6). Director Defendants additionally argue the claims against Director Brian P. Friedman should be dismissed pursuant to Rules 4(e), 4(m), and 12(b)(5) of the Federal Rules of Civil Procedure. K-Sea Defendants' motion to dismiss is granted: Plaintiffs' claims are dismissed in part with prejudice and in part without prejudice. Director Defendants' motion to dismiss is granted: Plaintiffs' claims as to them are dismissed with prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND

K-Sea Transportation Partners, L.P. ("K-Sea"), based out of New Brunswick, New Jersey, provided marine transportation, distribution, and logistics services in the United States. Am. Compl. ¶ 2. In September 2009, K-Sea's fleet consisted of 69 tank barges and 66 tug vessels. *Id.* K-Sea operated these barges to serve customers such as petroleum companies, oil traders, and refiners. *Id.* This case involves the sharp decline of K-Sea's stock and ensuing acquisition of K-Sea by Kirby Corp., following a series of negative disclosures of its underperforming 2010 fiscal year. *Id.* ¶¶ 11-15. K-Sea's 2010 fiscal calendar began July 1, 2009 and ended June 30, 2010. *Id.* ¶ 4.

On August 9, 2012, Plaintiffs filed an Amended Complaint. ECF No. 21. The Class Period begins on May 1, 2009, the day K-Sea announced its 2009 third quarter fiscal results, and runs until January 27, 2010, the day before K-Sea announced its 2010 second quarter fiscal results. Am. Compl. ¶ 1. Throughout the Class Period, Defendant Timothy Casey ("CEO Casey") was K-Sea's President and Chief Executive Officer, Defendant Terrance Gill ("CFO Gill") was K-Sea's Chief Financial Officer, Defendant Thomas Sullivan ("COO Sullivan") was K-Sea's Chief Operating Officer, and Defendant Richard Falcinelli ("VP Falcinelli") was K-Sea's Vice President. Plaintiffs allege that throughout the Class Period, by a variety of statements

and accounting measures, Defendants misled investors as to the actual state of K-Sea's financial affairs. *Id.* ¶ 6.

Through six Confidential Witness accounts, Plaintiffs allege that as early as late 2008 and early 2009, K-Sea's upper management was informed of an ensuing decline in utilization rates of its fleet. *Id.* ¶ 72. Plaintiffs claim that despite this knowledge, through its public statements, conference calls with investors, and public filings, K-Sea did not inform investors of the impending decline in the utilization rates of both its single hull and double hull ships and that large customers were not renewing their fixed utilization contracts with K-Sea. *Id.* ¶¶ 3-4.

On May 1, 2009, K-Sea announced its favorable third quarter fiscal year 2009 performance and held a related conference call. *Id.* ¶¶ 75-79. On August 4, 2009, K-Sea announced its generally positive fourth quarter fiscal year 2009 performance and held a related conference call on August 5, 2009. *Id.* ¶¶ 88-94. On August 7, 2009, K-Sea conducted a secondary offering and in conjunction with the offering filed a Form 424B5 prospectus supplement. *Id.* ¶¶ 99-100. The secondary offering raised in excess of 59 million dollars. *Id.* ¶ 7. On September 14, 2009, K-Sea filed a Form 10-K with the SEC that reiterated its previously announced fourth quarter fiscal year results for the period ended June 30, 2009. *Id.* ¶ 105.

On October 28, 2009, K-Sea announced its first quarter fiscal year 2010 performance and conducted a related conference call. *Id.* ¶ 110. The first quarter of K-Sea's fiscal year ended September 30, 2009. *Id.*; Ex. F. The results were not favourable. K-Sea reported a $1.3 million operating loss, including an asset impairment charge of $5.9 million relating to the write-down of its single hull ships. *Id.*; Am. Compl. ¶ 8. Before the asset impairment charge, K-Sea's operating income had decreased $5.3 million, or 54% as compared to the same quarter in 2008. Ex. F. Earnings before interest, taxes, depreciation and amortization ("EBITDA") was $18.2 million, a

decrease of $4.5 million, or 20%, compared to the same quarter the year before. *Id.* K-Sea announced its distribution to unitholders dropped from $0.77 per unit to $0.45, or $1.08 annualized. *Id.*; Am. Compl. ¶ 4. According to the Amended Complaint, this annualized rate was previously projected at $3.08 per unit. *Id.* Consequently, on the day of the announcement the price of K-Sea's units dropped from $22.45 to $14.00. *Id.* ¶ 10. The next day K-Sea units fell by an additional $2.86 and closed at $11.14. *Id.*

On December 9, 2009, Defendants CFO Gill and CEO Casey conducted a presentation at a Wells Fargo analyst symposium and participated in a Q & A. *Id.* ¶ 117. And prior to the market's opening on January 28, 2010, K-Sea released its operational results for the second quarter of the 2010 fiscal year which ended on December 31, 2009. *Id.* ¶ 122; Ex. K. The results continued to be negative. K-Sea reported an operating income of $1.3 million, a decrease of 8.1 million compared to a comparable fiscal quarter in 2008. *Id.* Its EBITDA was $15.9 million, a decrease of $7.2 million, or 31%, compared to the same quarter the year previous. *Id.* K-Sea also disclosed a $1.7 million non-recurring charge in connection with its acquisition of a Norfolk waste water treatment facility which, according to K-Sea, was purchased "in excess of its fair value." *Id.*; Am. Compl. ¶ 12. K-Sea suspended its distribution in order to "appl[y] its cash flow to reduce debt." Ex. K. That day K-Sea's stock fell another $4.99 and closed at $9.89. Am. Compl. ¶ 13

On September 1, 2010, K-Sea accepted a direct equity investment of up to $100 million in an attempt to staunch the loss of capital. *Id.* ¶ 14. In exchange, the investors, KA First Reserve, LLC received convertible preferred units. *Id.* ¶ 126. That same day K-Sea confirmed financial losses relating to its single-hull vessels, it incurred a $12.6 million asset impairment charge for the year, in addition to a $54.3 million goodwill write-off. *Id.* K-Sea reported a $43.9

million decrease in revenue compared to the earlier fiscal year, which was attributed to the retirement of most of the Company's single-hull ships and reductions in utilization and use of vessels in the spot market. *Id.* In fiscal year 2010, K-Sea recorded a net loss of $87.4 million. *Id.* ¶ 127.

The equity investment proved insufficient and in July 2011 Kirby acquired K-Sea for approximately $600 million. *Id.* ¶ 14. On February 3, 2012, Kirby Corporation announced a $.01 per share severance charge associated with the integration of K-Sea. *Id.* ¶ 5.

Specifically, Plaintiffs allege the following contained statements that were deceptively optimistic: K-Sea's May 1, 2009 statements made in the press release and conference call about its 2009 third quarter results, *id.* ¶ 75; representations made on a May 12, 2009 quarterly 10-Q form filed with the SEC reiterating the favourable K-Sea's third quarter 2009 results, *id.* ¶ 87; K-Sea's August 4, 2009 public statements about its 2009 fourth quarter results, *id.* ¶ 88; statements made during an August 5, 2009 conference call to discuss the fourth quarter earnings, *id.* ¶ 89; representations made in an August 7, 2009 Form 424B5 prospectus supplement filed in conjunction with its secondary offering that day, *id.* ¶ 100; representations made on a September 14, 2009 annual 10-K form filed with the SEC relating to K-Sea's 2009 fourth quarter and fiscal year results, *id.* ¶ 105; K-Sea's October 20, 2009 statements made in the press release and conference call relating to its first quarter 2010 results, *id.* ¶¶ 110-111; and finally, representations made by CEO Casey and CFO Gill at a December 9, 2009 Wells Fargo Symposium Q & A, *id.* ¶ 117.

At the same time K-Sea was making these various public statements, K-Sea's single-hull fleet was being phased out. In 1990, the Oil Pollution Act ("OPA") mandated the phasing out of single-hull, double-sided, and double-bottomed tanker vessels based on tonnage and age,

beginning in 1995 and ending in January 2015. *Id.* ¶¶ 54-55. At a December 2003 meeting, the Marine Environment Protection Committee of IMO adopted an accelerated phase out for the single-hull tankers. *Id.* ¶ 56. Under that framework, single-hull vessels delivered on or before April 5, 1982 were to be phased out before April 2005 and Category 2 and 3 tankers, single-hull vessels that were double sided or double-bottomed delivered after 1984, were to be phased out by 2010. *Id.* Plaintiffs contend these IMO regulations effectively accelerated the phase out date of single hull ships from 2015 to 2010. *Id.* ¶ 57. During the Class Period 19% of K-Sea's fleet consisted of single-hull ships. *Id.* ¶ 2.

Plaintiffs say that K-Sea's response to this shifting regulatory scheme and subsequent drop in market demand for single hull vessels was materially misleading. Specifically, they claim that on its SEC filings K-Sea misled investors about the decreasing demand for single-hull ships. *Id.* ¶¶ 87, 105. Plaintiffs also claim during the Class Period K-Sea failed to record an asset impairment loss relating to its single-hull fleet in violation of General Accepted Accounting Procedures ("GAAP"). *Id.* ¶ 85.

Next, Plaintiffs argue K-Sea's method for dry dock maintenance accounting was misleading. According to them, K-Sea violated GAAP by recognizing maintenance expenses on its single-hull fleet as capitalized expenses, thus deferring the recognition of such expenses in order to decrease operating expenses and inflate net income and assets during the Class Period. *Id.* ¶ 106.

Lastly, Plaintiffs argue K-Sea's 424B5 prospectus supplement filed with its secondary offering was misleading because it failed to inform investors that its lease of a water treatment facility in Norfolk, Virginia was expiring, and that K-Sea would need to overpay by 1.7 million for the purchase of the facility to keep its oily water disposal business. *Id.* ¶ 102.

In sum, Plaintiffs charge Defendants with misleading misrepresentations made through K-Sea's public statements and accounting measures, which caused K-Sea's stock to trade at artificially high prices, especially and including at the time of K-Sea's secondary offering.

On December 17, 2012, Defendants K-Sea Transportation Partners L.P, K-Sea General L.P., K-Sea General Partner GP LLC, Kirby Corporation, Timothy J. Casey, Thomas M. Sullivan, Terrance P. Gill, and Richard P. Falcinelli ("K-Sea Defendants") moved to dismiss the Amended Complaint. ECF No. 42. On the same day, K-Sea's board of directors, Defendants Anthony S. Abbate, Barry J. Alperin, James J. Dowling, Brian P. Friedman, and Frank Salerno ("Director Defendants") incorporated the substantive arguments made in K-Sea Defendants' brief and also moved to dismiss arguing Plaintiffs had not pled with sufficient particularity to implicate them. ECF No. 43. Director Defendants additionally argue Director Friedman was not properly served. *Id.* Plaintiffs oppose. ECF No. 46.

## STANDARD OF REVIEW

### I. Motion to Dismiss

In deciding a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 306 (3d Cir. 2007). Under Federal Rule of Civil Procedure 8(a)(2), the complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." At the same time, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). As a result, the complaint must contain more than "bare-bones allegations" or "threadbare recitals of the elements of a cause of action." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotations omitted). The plaintiff must allege "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008).

## II.      Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), prohibits the use of fraudulent schemes or devices in connection with the purchase or sale of securities. Under § 10(b), it is unlawful to "employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention" of any rule promulgated by the SEC designed to protect the investing public. To implement the statute, the SEC enacted Rule 10b-5, violation of which gives rise to a private cause of action. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975). That Rule, in turn, deems it unlawful:   (1) "To employ any device, scheme, or artifice to defraud," (2) "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," or (3) "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5.

To state a claim under Section 10(b) the plaintiff must prove knowledge by the defendant, an intent to defraud, misrepresentation or failure to disclose, materiality of the information and, injurious reliance by the plaintiff. *Thomas v. Duralite Co.*, 524 F.2d 577 (3d Cir. 1975). More precisely, 10(b) actions include the following elements:

(1) a material misrepresentation (or omission);

(2) scienter, a wrongful state of mind;

(3) a connection with the purchase or sale of a security;

(4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation;"

(5) economic loss; and

(6) "loss causation," a causal connection between the material misrepresentation and the loss

*See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (citations omitted).

Additionally, to sustain a securities fraud claim Plaintiffs must comply both with the particularity requirements of Fed. R. Civ. P. 9(b), *In re Supreme Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006), as well as the "[e]xacting pleading requirements" of the PSLRA. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

## III.    Rule 9(b)

Fed. R. Civ. P. 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." "The purpose of Rule 9(b) is to provide notice of the 'precise misconduct' with which defendants are charged" in order to give them an opportunity to respond meaningfully to a complaint, "and to prevent false or unsubstantiated charges." *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d

Cir. 1998) (abrogated on other grounds as recognized in *Forbes v. Eagleson*, 228 F.3d. 741 (3d Cir. 2001).

## IV.    Private Securities Litigation Reform Act & Scienter

Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2), to add to the Rule 9(b) standard a "uniform and stringent pleading requirement." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 584-585 (quoting S. Rep. No. 104-98, at 15 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 694). The PSLRA "substantially heightened the existing pleading requirements" for private securities litigants, *In re Rockefeller Center Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (citation and internal quotation marks omitted), in order to act "[a]s a check against abusive litigation by private parties." *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 313 (2007). Under the PSLRA, a complaint alleging Section 10(b) violations must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all the facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1). A Court must review each allegation separately, examining carefully all fraud allegations. *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 712 (3d Cir. 1996).

The PSLRA specifically addresses the scienter requirement of a § 10(b) claim. It requires that a complaint which asserts a § 10(b) claim "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To satisfy this pleading requirement, plaintiffs must state with particularity facts which show that defendants had either (1) both motive and opportunity to commit fraud or (2) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997); *Acito v. IMCERA*

*Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995). Recklessness, in turn, involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir. 1979) (internal citation and quotation omitted). Conscious behavior in this sense refers to "intentional fraud or other deliberate illegal behavior." *Id.*

## V.     Section 20(a)

Section 20(a) creates liability for "controlling persons" in a corporation, 15 U.S.C. § 78t(a), and imposes joint and several liability upon anyone who "controls a person liable under any provision of" the Securities Exchange Act of 1934. To maintain a claim under § 20(a), the plaintiffs must establish (1) an underlying violation by a controlled person or entity, (2) that the defendants are controlling persons, and that they were "in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 885 (3d Cir. 1975) (citation and quotation omitted).

## DISCUSSION

## I.     Section 10(b) Claims

### A.  Confidential Witness Statements Supporting the Alleged Misrepresentations

To support claims of misrepresentation Plaintiffs reply upon the accounts of six Confidential Witnesses ("CW").

CW 1 was the controller of K-Sea's Pacific Division from 2007 through November 2009 whose responsibilities included preparing budgets for the upcoming fiscal year. Am. Compl. ¶ 62. CW 1 prepared the Pacific Division budget for fiscal year 2010, which forecasted a decline in K-Sea's Pacific Division utilization rate by 30%. *Id.* CW 1 states that during a conference call

with K-Sea's senior management, CEO Casey "'flat out rejected' the budget, stating that the Pacific Division staff 'didn't know what [they] were talking about'" and insisted that the Pacific Division and the company overall would achieve an 80-85% utilization rate. *Id.* CW 1 stated that upon telling the management that they were losing long-term contracts, CEO Casey was "adamant that he could get 80% utilization" but CW 1 "felt it could be 30%." *Id.* According to CW1, all Company management had access to "Flash Reports" which compared budgeted and actual results. *Id.* CW 1 alleges all management had access to the Pacific Region's 2010 budget, which forecasted declining utilization rates. *Id.* CW 1 had "numerous" calls with CEO Casey, and stated "[w]e didn't believe Tim Casey had much credibility. We had ongoing conversations where we [the Pacific Division Staff] kept saying utilization rates were going to decrease." *Id.*

CW 1 also alleged that in "early 2009" it became apparent that "customers were not going to extend long-term contracts because of the declining utilization of tugs." *Id.* ¶ 63. CW 1 stated that "he did not believe that the Company could accurately report an 80% utilization rate in August 2009" and that since the "Pacific region's utilization was 25%, the East Coast region could not have made up for that loss to sustain a utilization rate of 80%." *Id.* ¶ 64.

Finally, CW 1 alleged K-Sea improperly capitalized routine maintenance repairs as dry dock costs, stating K-Sea "capitalized scheduled dry docks and depreciated those costs over three years which increased EBITCA, spreading costs over the year." *Id.* ¶ 65. When CW1 tried to discuss this with the Comptroller, she refused to discuss it since, CW 1 claimed "she worked for the public accounting firm that audited K-Sea and approved this process." *Id.*

CW 2 was the Pacific Division Manager at K-Sea from 2006 through July 2011. CW 2 stated single hull and double hull utilization rates began to drop by mid-2009 for both single and double hull vessels, driven by the major oil companies facing the economic downturn. *Id.* ¶ 66.

CW 2 remarked "[t]he wheels were falling off" for the entire market by mid-2009 "for both single hull and double hull vessels." *Id.* And the major oil companies were not committing to long-term contracts in 2009, instead moving to short term contracts which K-Sea did not offer. *Id.* Finally, CW 2 noted that the major oil companies would no longer permit the hauling of oil on single hull ships. *Id.*

CW 3 was a senior accountant in the Company's Pacific Division from July 2008 through November 2010. CW 3 revived a Company Flash Report and concluded the East Coast's business was "down further than the Pacific Division." *Id.* ¶ 67. CW 3 claims this report was seen by all senior management.

CW 3 stated he was told by colleagues in the Pacific Division and corporate accounting staff that, "corporate was predicting that a slowdown was going to happen." In response, the Pacific Division budgeted for necessary maintenance and a reduction in work days and reduced the number of work days expected for its flex contracts (where the company paid K-Sea for each day worked by a K-Sea employee), anticipating a reduction in revenue for 2010. *Id.* ¶ 68. CW 3 stated "[w]e were saying things were going to decrease. A lot of contracts were coming up for renewal and business was slowing down everywhere. We worked that into our budget. Corporate changed the whole budget. Days were added [to flex contracts] and costs were taken out for repairs." *Id.* CW 3 was told by Assistant Corporate Controller Suresh Coomar that "stuff's going to happen but we'll be fine," which CW 3 took to mean that K-Sea was about to have financial difficulties but would manage through them. *Id.*

CW 3 also expressed the belief that K-Sea took its $5.9 million asset impairment charge in the 2010 first fiscal quarter to cover-up declining utilization rates. *Id.* ¶ 69. CW 3 stated

single-hull vessels were still being used in 2009 because the double-hull vessels commissioned by K-Sea were not ready. *Id.* ¶ 69.

CW 4, the accounts payable accountant for K-Sea's Pacific Division from 2005 through December 2010, remarked that in 2009 "[w]e had a lot of boats that weren't being used as much" and recalled a number of contracts lost in 2009. *Id.* ¶ 70. CW 4 noted K-Sea began coding lots of large bills under dry dock and commented, according to the Complaint, "I just remember thinking wow, they are sending everything into dry dock [for accounting purposes]." *Id.* 70.

CW 5, was a human resources manager with K-Sea. *Id.* ¶ 71. CW 5 recalled in late 2008 and early 2009 K-Seas VP of business development, Chuck Kauffman, and CW 1 discussed K-Sea's slow down. CW 5 reported that by February 2009, the Pacific Division was getting word that customers were not going to renew their 2 year contracts. *Id.* CW 5 knew of this slowdown because CW 5 had to staff K-Sea's west coast boats and lay off crews if business slowed. *Id.*

CW 5 also recollects employees in the Pacific Division raising concerns about K-Sea's method for dry dock maintenance accounting, and believed that employee's concerns related to K-Sea's practice of incorrectly labeling ship repairs as scheduled maintenance. *Id.* CW 5 stated that, if for example a ship was in an accident and needed to be repaired, the Company recorded the repair as a scheduled dry dock. CW 5 stated that the dry dock managers thought this practice was "weird." *Id.*

CW 6 was the terminal manager at the Norfolk Water Treatment Facility for K-Sea subsidiary Norfolk Environmental Services from December 2005 through December 2010. CW 6 stated the purchase price for the Norfolk facility was set out in the original purchase agreement dated December 2004, which allowed K-Sea to lease the facility for five years with an option to purchase at the end of the lease period. *Id.* ¶ 72. CW 6 hired a consultant to access the value of

the facility in 2009, and it was assessed "considerably lower" than the set purchase price in K-Sea's contract. *Id.*

CW 6 also states that in 2009, NES accepted, upon approval of COO Sullivan, approximately 21 million gallons of oily water from Petro Canada and Husky Oil for treatment at the Norfolk facility. *Id.* ¶ 73. NES then accepted an additional 7 million gallons of oily water from Husky Oil. *Id.* The Norfolk facility lacked the capacity for so much oily water, and NES rented barges from K-Sea to store the water. *Id.* The facility required additional repairs to process the water, but COO Sullivan refused to release the funds and instead applied more pressure for the facility to process the water to free up the barges. *Id.* The facility had mechanical issues and had to be shut down for repairs. Eventually, it was forced to close permanently due to regulatory pressure. *Id.*

Defendants argue these Confidential Witness accounts are deficiently pled. Def. Mot. to Dismiss, 32. The Third Circuit has explained Confidential Witness allegations are subject to the PSLRA's heightened pleading requirements. *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 263 (3d Cir. 2009). "In the case of confidential witness allegations, we apply [the PSLRA requirements] by evaluating the 'detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.'" *Id.* (quoting *California Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2006)). If the Confidential Witness allegations do not meet the PSLRA's exacting requirements, then Courts are instructed to "discount them steeply." *Id.* However, "if, on the other hand, a complaint's confidential witness allegations are adequately particularized, we will not dismiss them simply on account of their anonymity." *Id.*

Defendants argue CW 1, 2, and 3's allegations are insufficiently pled since they are not "specific to support an inference of either falsity or scienter and in many cases are wholly irrelevant." Def. Mot. to Dismiss, 33. As example, Defendants argue CW 1's belief that the Company could not "accurately report an 80% utilization rate in August 2009" is deficient because the utilization figures announced in May and August had no bearing on the utilization figures beginning Fiscal Year 2010. They also argue CW 1's claim is irrelevant since K-Sea actually obtained 86% utilization in the first quarter of 2010 and "was not anywhere near the 20-25% or even 30%. Mot to Dismiss, 34. Similarly, Defendants argue CW 2 and 3's statements as to the decline in utilization rates are irrelevant. Defendants contend to the extent that the statements are true, the accounts of CW 1, 2, and 3, simply refer to a "legitimate business disagreement." Def. Mot. Dismiss, 34.

These arguments only challenge the merit of the statements, but do not address whether the Confidential Witness accounts were themselves plausible, reliable, or made with sufficient knowledge. What is more, the witness statements are not without merit. CW 1's contention that K-Sea's upper management knew of the decline in utilization rates, Am. Compl. ¶ 68, is central to Plaintiff's contention that K-Sea failed to inform investors of the impending decline. This Court will decide the relative strength of the evidence offered by both parties and will consider the value of these contentions at a later time.

Plaintiffs next question CW 1's credentials since a "controller" would be responsible for historical accounting and would not interface with customers or sell services. Nevertheless, this Court finds CW 1 could have based his accounts based on CW1's assertion that CW 1 prepared the 2010 budget. CW 1 also testified as to first-hand conversations with senior management. Likewise, CW 2 and 3 held management and accounting positions that would have given them

access to information upon which to base their statements. By providing witnesses job titles and by detailing the witnesses' first-hand accounts with specifics Plaintiffs have alleged Confidential Witness statements provided by CW 1, 2, and 3 with sufficient particularity to meet the requirements of the PSLRA.

Defendants also challenge the accounts of CW 4 and 5 because "[n]either witness is alleged to have had any role whatsoever with respect to K-Sea's public disclosures or even the 2010 budget, and neither is alleged to have actually participated in discussions with corporate management regarding the budget." Def. Mot. to Dismiss, 36. Defendants cite *In Re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 361 (D.N.J. 2007), where the court discounted information repeating information heard that was not "provid[ed] firsthand." And insofar as CW 4 and CW 5 were merely relaying information heard this Court will discount that information. As example, this Court will not consider CW 5's contention that dry dock managers thought an accounting practice was "weird." Am. Compl. ¶ 71.

But this Court finds Plaintiffs have sufficiently pled that CW 4 and 5's drew some conclusions based upon their own experience. Again, as example, even if CW 4 was not involved in preparing the budget directly CW 4 still made valid observations as to the state of K-Sea's business. Through his job as accountant he coded bills and noticed an unusual number of bills being sent to dry dock. Am. Compl. ¶ 70. CW 5 noticed in a slowdown of business because CW 5 had to lay off crews. *Id.* ¶ 71. The Court will consider statements based upon CW 4 and 5's own observations.

Finally, Defendants argue that as to CW 6, Defendants have failed to provide "why these allegations have any relevance whatsoever to this lawsuit." Def. Mot. to Dismiss, 36. This Court will consider CW 6's statements to the extent that the difference between the purchase price and

the value of the Norfolk facility may relate to Plaintiffs' allegation that 424B5 prospectus supplement filed in conjunction with its secondary offering was misleading because it failed to inform investors that its lease of a water treatment facility in Norfolk, Virginia was expiring, and that K-Sea would need to overpay for the purchase of the facility by $1.7 million in order to keep its oily water disposal business. Am. Compl. ¶ 102. However, this Court will not consider CW 6's statements that relate to the particulars of the Norfolk water treatment business operations because Plaintiffs have not given any explanation as to why or how these statements relate to their allegations.

### B. Alleged Material Misrepresentations

Defendants next argue Plaintiff's Amended Complaint should be dismissed for five reasons: first, they argue the Amended Complaint "fails to comply with the PSLRA's requirement to plead particularized facts showing that the statements challenged by Plaintiffs were actually false." Def. Mot. to Dismiss, 2. Second, they claim it "fails to comply with the PSLRA's requirement to plead particularized facts raising a strong inference of scienter." *Id.* Third, Defendants argue the statements challenged by Plaintiff were accompanied by "extensive specific cautionary language and are immunized by the PSLRA's safe harbor for forward-looking statements." *Id.* at 3. Fourth, since certain Defendants are not alleged to have made any of the challenged statements "the claims against those defendants fail as a matter of law." *Id.* And finally, fifth, Defendants allege Plaintiffs claims regarding K-Sea's impairment charge are "barred by the two-year statute of limitations." *Id.*

### 1. May 1, 2009 Operating Results and Related Conference Call

### a. Materiality

On May 1, 2009, K-Sea issued a press release announcing its operating results for its third quarter of fiscal year 2009 and conducted a related conference call to discuss the results with market analysts. Ex. A; Ex B. CEO Casey, CFO Gill, and Director Dowling represented K-Sea on the call. Ex. B.

Plaintiffs challenge the following statements by CEO Casey made in K-Sea's third quarter of Fiscal Year 2009 announcement:

> We continue to experience solid vessel utilization and average daily rates primarily due to our significant proportion of long-term charter contracts. Am. Compl. ¶ 75; Ex. A.
>
> As vessel utilization likely experiences a seasonal strengthening in the current quarter, we expect EBITDA will increase sequentially, as it has in the past. *Id.*
>
> [M]anagement recommended, and the Board determined, to maintain our quarterly distribution at $0.77 per unit or $3.08 annualized. *Id.*

Plaintiffs also challenged various statements made by CEO Casey, CFO Gill, and Director Dowling during the conference call:

CEO Casey said:

> Our strategy has been to find contracts for our double hull barges and use our single hull barges in the spot market to back up the double hull barges while they are out of service for regulatory inspection and repair. This strategy continues to work as you can see in our press release. Utilization remains strong at 85% and within our historical range of 83 to 87%. Am. Compl. ¶ 76; Ex. A.
>
> We believe the only downside to more spot market vessels is it may make our quarterly forecasting a little more challenging. But we do not expect any material effect on our yearly results. *Id.*
>
> [D]emand for the single-hull equipment seems to be dropping to some extent. *Id.*

CFO Gill stated:

> As of March 31, 2009 our ratio of debt to book capital was 59% compared to 61% at June 2008, and we continue to be in a good liquidity position. The cash availability from our bank revolver and other loan agreements are in excess of $81 million, more than enough to cover our construction progress payments and debt service. Am. Compl. ¶ 77

> We believe that the cash flows from operations and borrowings under our credit facilities and other loan agreements, described below, plus our access to the long-term debt and equity markets, will be sufficient to meet our liquidity needs for the next twelve months and for the long term. Am. Compl. ¶ 86; Ex. A.

> As of March 31, 2009 and June 30, 2008, we were in compliance with all of our debt covenants. *Id.*

Director Dowling added:

> [W]e think the long-term future of the company is still very bright and promising. Am. Compl. ¶¶ 77-78; Ex. A.

In response to Plaintiffs' Amended Complaint Defendants provide the full press release of K-Sea's third quarter of Fiscal Year 2009 announcement on May 2009 and accompanying conference call.

CEO Casey is quoted in the press release as saying:

> We are committed in our effort to ride through these tough economic times, as evidenced by our general partner proposing to reinvest its distributions over the next several quarters in order to enhance our cash distribution coverage.

The press release contained a cautionary statement:

> This press release contains forward-looking statements, which include any statements that are not historical facts, such as the Company's expectations regarding business outlook, vessel utilization and rates, delivery and integration of new build and acquired vessels (including the cost, timing and effects thereof),

growth in earnings, cost increases (including insurance calls), the benefits of long-term charters, distributable cash flow and distributions per unit, and future results of operations. These statements involve risks and uncertainties, including, but not limited to, insufficient cash from operations, a decline in demand for refined petroleum products, a decline in demand for tank vessel capacity, the effects of the economic recession, intense competition in the domestic tank barge industry, the occurrence of marine accidents or other hazards, the loss of any of the Company's largest customers, fluctuations in charter rates, delays or costs overruns in the construction of new vessels, failure to comply with the Jones Act, modification or elimination of the Annual Report on Form 10-K and other filings with the Securities and Exchange Commission. If one or more of these risk or uncertainties materialize (or the consequences of such a development changes), or should underlying assumptions prove incorrect, actual outcomes may vary materially from those forecasted or expected. The Company disclaims any intention or obligation to update publicly or revise such statements, whether the result of new information, future events or otherwise.

During the conference call CEO Casey stated:

The economic slowdown coupled with the final phase of the industry's transition to double hull vessels have provided a challenging backdrop to our goal of always delivering for our unit holders.

Conditions may be choppy for the next 12 months.

[W]e have several contracts expiring.

[D]emand for single hull ships seems to be dropping to some extent.

[T]hey'll be excess capacity as defined as single hull barges in the market for the next 12 months and those single hull barges are not typically able to get long term contracts.

[W]e have about seven or eight long term contracts that are going to be rolling over the next 12 months.

Exs. A-B

Plaintiffs plead the challenged statements made on May 1st, "were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them, including that: (1) true utilization rates were dropping more rapidly than the Defendants were revealing; (2) customers were informing K-Sea that they were not renewing their long-term contracts with K-Sea; (3) the Company was not in a good liquidity position as it would soon have to cut and even eliminate its dividend distribution in order to conserve cash; and (4) as a result of the foregoing, the Company's statements were materially false and misleading when made." Am. Compl. ¶ 79.

Defendants argue the "historical results for the last two quarters of fiscal 2009, . . . are not promises or projections of future utilization, and Plaintiffs do not contend that K-Sea misstated any historical utilization figures." Def. Mot. to Dismiss, 21. Defendants also allege any statements were "measured and directly refute Plaintiffs' allegations of falsity." *Id.* As such, Defendants argue Plaintiffs have failed to allege a material falsity or omission. *Id.*

At issue is whether K-Sea's failure to inform investors at their 2009 third quarter review that it was undergoing a decline in its business was a material misrepresentation or omission under Section 10(b) of the Securities Exchange Act, pled with sufficient particularity to satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the PSLRA.

Because "[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant," all data, including pre- and post-class period data may be used. *See In re Merck & Co. Inc., Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) (citation omitted). Plaintiffs may plead "falsity by alleging various sources for the 'true facts' known or recklessly disregarded by defendants," and may include documentary evidence and "representations of

confidential witnesses." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 260 (3d Cir.

2009).

In Section 10(b) and Rule 10b-5 actions, "[a] statement is false or misleading if it is

factually inaccurate, or additional information is required to clarify it." *In re Nice Sys., Ltd. Sec.*

*Litig.*, 135 F. Supp. 2d 551, 573 (D.N.J. 2001) (citations and quotations omitted); *In re Campbell*

*Soup Co. Securities Litigation*, 145 F. Supp. 2d 574, 583 (D.N.J. 2001). Not just any false or

misleading statement gives rise to liability; instead, only a material representation or omission is

actionable. *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988); *Campbell Soup*, 145 F. Supp. 2d at

583.

The Supreme Court "declined to adopt a bright-line rule for determining materiality . . .

observing that '[a]ny approach that designates a single fact or occurrence as always

determinative of an inherently fact-specific finding such as materiality, must necessarily be over

inclusive or underinclusive.'" *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1312

(2011) (citing *Basic*, 485 U.S. at 231). A fact is material if a reasonable investor would view it as

having "significantly altered the 'total mix' of information made available" to the investing

public. *Id.* at 231-32; *see also EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 872 (3d Cir.

2000).

However, "[t]he securities laws do not require a defendant 'provide the public with all

material information.'" *Winer Family Trust v. Queen*, 503 F.3d 319, 329 (3d Cir. 2007) (quoting

*Burlington Coat Factory Securities Litigation*, 114 F.3d at 1432 (internal citations omitted)). A

defendant cannot be held liable for failure to disclose unless plaintiff first demonstrates that

defendant, indeed, had a duty to disclose. *See Basic*, 485 U.S. at 239 n.17 ("Silence, absent a

duty to disclose, is not misleading under Rule 10b-5."). "As a general matter an affirmative duty

arises only when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete, or misleading prior disclosure." *Winer*, 503 F.3d at 329 (quoting *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d. Cir. 2000)). A duty arises "only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx*, 131 S.Ct. at 1317 (internal citations and quotations omitted).

Here, Plaintiffs effectively plead K-Sea's management knew about a forecasted decline in its utilization rates to take effect in fiscal year 2010. CW 1 testified that all management had access to the Pacific Region's 2010 budget which predicted declining utilization rates in the Pacific region and CW 1 recalled specific conversations had with upper management about the impending decline. Am. Compl. ¶ 62. CW 2 and 3 both testified to a slow-down in the market for both single-hull and double-hull vessels. *Id.* ¶¶ 66; 67-69.

And Plaintiffs have even alleged that the eventual decline in business was material. An alternative standard exists for determining materiality in the context of an "efficient" market. *Burlington Coat*, 114 F.3d at 1425. Since "'efficient markets are those in which information important to reasonable investors . . . is immediately incorporated into stock prices,' it necessarily follows that 'the concept of materiality translates into information that alters the price of the firm's stock.'" *In re Lucent Technologies, Inc. Securities Litigation*, 217 F. Supp. 2d. 529, 543-544 (D.N.J. 2002) (citing *Burlington Coat*, 114 F.3d at 1425 (citations omitted)). Here, during the announcement of its first quarter fiscal year 2010 results in October 2009, K-Sea disclosed a drop in revenue, a decrease in the number of long-term contracts, and a lowering of the distribution to unitholders. As a result, K-Sea's units dropped from $22.45 to $14.00 and dropped to $11.14 the next day. Am. Compl. ¶ 4; Ex. F.  A significant decline in business is material to investors.

Nevertheless, Plaintiffs cannot simply cast statements about K-Sea's fiscal year 2009 third quarter earnings as statements about K-Sea's first quarter 2010 earnings. As example, CEO Casey stated "[w]e continue to experience solid vessel utilization and average daily rates primarily due to our significant proportion of long-term charter contracts." This announcement was in regard to the third quarter of fiscal year 2009 earnings, which ran the three months ending March 31, 2009. Ex. B. Plaintiffs do not allege that the representations made were false as applied to the third fiscal quarter of fiscal year 2009. Plaintiffs do not allege that during that time K-Sea's long term contracts had in fact expired, only that, as CW 2 explained, oil companies were "*moving to* short term contracts which K-Sea did not offer." Am. Compl. ¶ 12 (emphasis added). K-Sea's 2010 fiscal year began July 1, 2009, two months after the May 2009 announcement. At the time of the announcement, no such move had occurred. Likewise, remarks about the third quarter distribution and utilization rates were not misleading.

And CFO Gills' statements about ratio of debt, cash flows, and assurance that K-Sea was in compliance with its debt covenants, Ex. A., were not misleading because, as of May 2009, these statements were accurate. CFO Gill's forward looking statements proved true. He predicted "[t]he cash availability . . . [is] more than enough to cover our construction progress payments and debt service." Am. Compl. ¶ 77. Plaintiffs do not provide evidence that K-Sea defaulted on its debt covenants, Defendants say they did not. Def. Mot. to Dismiss, 23.

In their opposition to Defendants' motion, Plaintiffs argue Defendants were under a duty to disclose the impending decline because K-Sea's business model was obsolete. Opp., 20-22. Plaintiffs refer to *Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Swanson*, No. 09-799, 2011 WL 2444675, at *9-11 (D. Del. June. 14, 2011), where Plaintiffs brought a securities fraud class action following the bankruptcy of a printer of yellow page directories and

provider of online local commercial search tools.  The *Swanson* Defendants were in the midst of

a rapid decline in sales, in a market numerous forecasters had declared as obsolete, and they

nonetheless "made numerous statements about the strength and stability of the print yellow pages

market" as well as "flatly denied the existence of a secular shift in the local search industry and

stated that economic 'cyclical' factors caused the decline in business." *Id.* at 10.

Defendants counter that K-Sea's business model was not obsolete, and, unlike the

Defendants in *Swanson*, Defendants allege the statements they made were qualified. Rep. Br., 4.

Defendants allege the downturn in business was due to an industry wide slowdown caused by the

decrease demand for single hull ships. *Id.* This Court agrees that K-Sea was not in the midst of

the type of catastrophic decline evident in *Swanson*. K-Sea's fleet remains operational under the

Kirby Corp. Am. Compl. ¶ 2.

What is more, the challenged statements were measured. Mot. to Dismiss, 21. Defendants

told investors "[t]he economic slowdown coupled with the final phase of the industry's transition

to double hull vessels have provided a challenging backdrop to our goal of always delivering for

our unit holders" and they warned "conditions may be choppy for the next 12 months." Ex. A.

They also made specific disclosures that they had "several contracts expiring," clarifying they

had "about seven or eight long term contracts that are going to be rolling over the next 12

months." Ex. B. In regard to the single hull fleet Defendants cautioned investors "demand for

single hull ships seems to be dropping to some extent" and that "they'll be excess capacity as

defined as single hull barges in the market for the next 12 months and those single hull barges

are not typically able to get long term contracts." *Id.* Plaintiffs were adequately warned that the

economic landscape was shifting. "The securities laws do not require a defendant to 'provide the

public with all material information." *Winer*, 503 F.3d at 329 (3d Cir. 2007).  Defendants were

under no duty to provide more dire specifics while disclosing their true, generally positive, fiscal year 2009 results. Allegations arising about the May 2009 challenged statements are dismissed with prejudice.

Plaintiffs also challenge Defendants' forward-looking statements: Defendant Dowlings remarked, "we think the long-term future of the company is still very bright and promising." Am. Compl. ¶¶ 77-78. This statement is a general expression of corporate optimism inactionable as a matter of law. *See In re NUI ASec. Litig.*, 314 F. Supp. 2d 388, 408 (D.N.J. 2004) ("[v]ague, non-specific statements of optimism" are not actionable); *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d. 242, 255 (3d Cir. 2009) (assertions that the company's "position" is "on track" to meet goals was "too vague to be actionable.")

CEO Casey predicted "[a]s vessel utilization likely experiences a seasonal strengthening in the current quarter, we expect EBITDA will increase sequentially, as it has in the past," *id.* ¶ 75, and stated "[w]e believe the only downside to more spot market vessels is it may make our quarterly forecasting a little more challenging. But we do not expect any material effect on our yearly results." *Id.* CFO Gill's stated "[w]e believe that the cash flows from operations . . . will be sufficient to meet our liquidity needs for the next twelve months and for the long term," Am. Compl. ¶ 86.

Plaintiffs charge that these statements were misleading because Plaintiffs knew utilization rates was declining as evidenced by its dropping utilization rates and lack of contract renewals. Am. Compl. ¶ 74. But as discussed earlier, these statements were made surrounded by significant qualifications. A reasonable investor would not have taken these assertions as promises of future performance when simultaneously warned of an "economic slowdown," "challenging backdrop," and "choppy" conditions. Ex. A.

### b. Scienter

Even if this Court were to accept that Defendants' forward-looking statements may have been misleading, the absence of scienter mandates dismissal. An Amended Complaint must be dismissed when it fails to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Here, at the time these statements were made, K-Sea's corporate management expected to turn around K-Sea's decline. CW 1 recalled a conference call with K-Sea's senior management, where CEO Casey " 'flat out rejected' the budget, stating that the Pacific Division and the company overall would achieve an 80-85% utilization rate. *Id.* ¶ 65. CW 1 stated CEO Casey was "adamant that he could get 80% utilization. *Id.* And in fact, K-Sea ultimately reported an upwards of 80% utilization through first quarter of fiscal year 2010. Exs. A-C.

Plaintiffs allege senior management's belief of a turnaround was "reckless" since management was informed of an impending decline. But scienter based upon recklessness requires "inexcusable negligence" and "an extreme departure from the standards of ordinary care." *Avaya*, 564 F.3d at 267 n. 42 (citations omitted). To satisfy scienter "a misrepresentation [must be] so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception." *In re Digital Island Sec. Litig.*, 357 F.3d 322, 332 (3d Cir. 2004). Defendants here were faced with an industry wide decline based upon an economic recession. The decline in business had not yet taken effect. Defendants believed the recession would turn around. CEO Casey later reflected "[o]ur optimism about the intermediate to long term derives from the belief that when the economic growth resumes in the US, the supply of tank barges in the size in which we concentrate and hold the leading position will have

been reduced to a point that stronger utilization and rates will be realized by K-Sea." Am. Compl. ¶ 89. This was not an unreasonable or reckless opinion.

Plaintiffs next argue "the May 1, 2009 disclosures were intended to materially mislead the Company's public investors to ensure a successful unit offering, which was required to avoid K-Sea's default on its obligations." Am. Compl. ¶ 74. But the 3rd Circuit has rejected these types of business motives as sufficient to satisfy scienter requirements. *See, e.g., GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) (internal citations omitted) ("Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal belief to the individual defendants resulting from this fraud.") Here, none of the corporate officers sold their stock before or after the secondary offering. There does not seem to be any indication that management personally benefited from its May 2009 announcement or its subsequent secondary offering.

Plaintiffs' claims based upon Defendants' May 2009 announcement and conference call are dismissed with prejudice.

## 2. Asset Impairment Charge

At its announcement of its third quarter fiscal year 2010 operating results on October 20, 2009, K-Sea declared it would take a $5.9 million asset impairment charge for its then obsolete single-hull fleet. Plaintiffs argue this asset impairment charge was taken too late in violation of General Accepted Accounting Principles ("GAAP"). GAAP consists of various standards, the highest authority of which is the Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Standards (FAS). *Id.* ¶ 83. FASB Statement of Financial Accounting

Standards No. 144 provides guidance as to when a company should record an asset impairment loss, *id.* ¶ 84:

> A long-lived asset (asset group) shall be tested for recoverability when events or changes in circumstances indicate that its carrying amount may not be recoverable. The following are examples of such events or changes in circumstances:
>
> a) A significant decrease in the market price of a long-lived asset (asset group)
> b) A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition
> c) A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action assessment by a regulator
> d) An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group)
> e) A current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecase that demonstrates continuing losses associated with the use of a long-lived asset (asset group)
> f) A current expectation that, *more likely than not*, a long lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life.

FAS No. 144.

Plaintiffs argue "K-Sea failed to properly record asset impairment charges for its sing [sic] hull vessels in accordance with FAS 144 Paragraph 8a-f" because the "triggering event for K-Sea should have been the Oil Pollution Act issued in August 1990, which would eventually phase out single hull vessels and thus decrease the market demands for such vessels." Am. Compl. ¶ 85. Plaintiffs contend that "[a]lthough the OPA would require phase out by 2015, the realities of the marketplace at the time had reduced the value of the Company's single-hull vessels to almost nothing." *Id.* They allege K-Sea misrepresented its financials by "understa[ting]

its expenses and oversta[ting] its assets and net income during the Class Period" by "fail[ing] to properly record such asset impairment losses in violation of GAAP." *Id.*

But Plaintiffs allegations are unavailing. Plaintiffs' contention that the triggering event should have been an Act that allowed for over a decade worth of continued use of the single hull fleet fails. As Defendants' point out the Oil Pollution Act of 1990 "allowed K-Sea to continue to use single-hull barges through 2014." Def. Mot. to Dismiss, 25.

Plaintiffs allege that as of 2009 the "realities" of the marketplace mandated an impairment charge in 2009. Yet Defendants expressed continued optimism that they could still utilize that fleet. CW 1 stated CEO Casey was "adamant that he could get 80% utilization." Am. Compl. ¶ 62. And indeed, despite CW 1's projections, Defendants achieved upwards of 80% utilization through the first quarter of Fiscal Year 2010. Ex. A (84% net utilization for three months ended March 31, 2009); Ex.D (82% utilization for three months ended June 30, 20009); Ex. F (86% utilization for three months ended September 30, 2009). CW 1 expressed that "he did not believe that the Company could accurately report an 80% utilization rate in August 2009" since the "Pacific region's utilization was 25%, the East Coast region could not have made up for that loss to sustain a utilization rate of 80%." But CW 1 was confined to budgeting for the Pacific Division. In their Wells Fargo Q & A CEO Casey explained that "[w]hile our rates in utilizations were acceptable [within the range of 80%] they masked what was really happening. During the quarter we employed about 10% of our fleet – 10% of our capacity, mostly our single-hulls to service our oily water processing plant in Norfolk, Virginia." Ex. H. Thus, despite CW 1's inability to conceive of how K-Sea achieved its utilization rate, K-Sea nevertheless continued to use its single hull fleet internally to achieve an upwards of 80% utilization rate.

Eventually, during its October 28, 2009 announcement of its first quarter fiscal year 2010 results, K-Sea announced an asset impairment charge of $5.9 million for its single hull fleet. Ex. F. CEO Casey explained that "[b]ased on our new market assessment, we have decided to write down the value of 12 of our remaining single-hull vessels to a level where we will be able to sell them in the markets outside of the United States for their scrap values. Our remaining single-hull barges on term contracts that will take them to their final retirement date at the end of the 2014." Ex. G. In the subsequent conference call with investors CEO Casey remarked "[w]e tried very hard to get the timing of the single-hull phase out right, but did not anticipate such a deep decline in the economy." Ex. F.

Part of K-Sea's single hull fleet was in use until 2014, and K-Sea used the single hull fleet internally to aid in its water treatment facility obligations, suggesting the single hull ships still held value for K-Sea. And, upon recognition of a decrease in value of its remaining single-hull fleets based upon a "new" assessment of the market, Defendants took an asset impairment charge. This Court finds the timing of K-Sea's asset impairment charge to be in compliance with GAAP, and dismisses these allegations with prejudice.

### 3.  May 12, 2009 Form 10-Q

Plaintiffs next argue the 10-Q form "was false and misleading as the Company disregarded and failed to disclose that it would have to replace its single-hull vessels much sooner than December 2014 since its customers were abandoning usage of single-hull vessels much faster than reported. The Company also omitted the material information that it would be unable to remain in compliance with its financial covenants." Am. Compl. ¶ 87. Because this Court has concluded K-Sea was under no obligation to disclose its pending financial condition at the time of its May 2009 disclosures and because this Court has determined the single hull fleet's

asset impairment charge was taken at the appropriate time, the information provided on the May 12, 2009 was not false or misleading. This allegation is dismissed with prejudice.

4. **August 4, 2009 Operating Results and Related August 5, 2009 Conference Call**

On August 4, 2009, K-Sea issued a press release announcing its operating results for its fourth quarter of fiscal year 2009 and conducted a related conference call to discuss the results with market analysts. Ex. D; Ex. CEO Casey and CFO Gill represented K-Sea on the call. Ex. E.

Plaintiffs challenge the following statements by CEO Casey made in K-Sea's fourth quarter of Fiscal Year 2009 announcement:

> Notwithstanding the current environment, we remain very optimistic about K-Sea's future.
>
> If all barges currently contracted to be constructed are in fact built and placed into service, and if all existing single-hulls are removed from service, total capacity in this size range would decline by approximately 18%. As the largest operator of barges in this size range, our market position would be enhanced.
>
> We therefore expect to maintain our current $3.08 per annual distribution through fiscal 2010. Am. Compl. ¶ 88

Plaintiffs also challenged various statements made by CEO Casey, CFO Gill during the conference call.

CEO Casey to analysts said:

> [T]he bottom line is we believe K-Sea will emerge from this period in yet a stronger industry position, poised to capitalize on new industry opportunities. We have recommended to the board, and they concurred, that we have operating wherewithal to keep our dividend flat. Am. Compl. ¶ 90.

So those vessels, we don't have any issues with those vessels. It's just the ones on the East Coast and the West Coast. And those contract terms seem to be shortening. *Id.*

I mean we have very few contracts ending between now and the end of 2009. The majority of them happen in the first and second quarter of 2010. And that's about 10% of our fleet. Am. Compl. 91

We expect [contract renewals] to be probably closer to 70% depending on how many contracts we renew in the interim period. *Id.*

…currently we are not seeing our customers decreasing the price-the day rate on our vessels. *Id.* ¶ 92

And when we look at it, if you cut your price by very much and your utilization is not great, you don't have a very good chance of generating the money that you need to pay for your drydocking. *Id.*

CFO Gill stated:

Additionally, we continue to be in a good liquidity position. The cash availability from our bank revolver and other agreements are in excess of 75 million, more than enough to cover the approximately 29 million of required progress payments due on our new build capital projects. *Id.* ¶ 93

Unmentioned by Plaintiffs, on the conference call with investors CEO Casey also stated:

As we have mentioned on previous calls, the demand for single hulled tank barges is particularly impacted by market slowdowns. Am. Compl. ¶ 89

[W]e believe 2009 will be a significant transition year. *Id.*

Our optimism about the intermediate to long term derives from the belief that when the economic growth resumes in the US, the supply of tank barges in the size in which we concentrate and hold the leading position will have been reduced to a point that stronger utilization and rates will be realized by K-Sea. *Id.*

Yeah. The contract duration and mostly these were on the East Coast vessels. You have to remember a lot of our

vessels in Alaska and in Hawaii are on long-term contract, so they don't expire for a considerable period of time, five to seven years. So those vessels, we don't have any issues with those vessels. It's just the ones on the East Coast and the West Coast. And those contract terms seem to be shortening. *Id.* ¶ 90

Plaintiffs argue the challenged statements were misleading because "Defendants knew that utilization rates for the first month of 2010 were dramatically below historical rates of 80%-85%, since the Pacific Division's utilization rates were 20% to 25%"; because K-Sea "knew that many customers, particularly the major oil companies, were not renewing their long term contracts, thus rendering their statements about contract stability among K-Sea's customers materially misleading"; and because "Defendants Casey and Gill misled investors as to K-Sea's overall condition and the expected dramatic slow-down in K-Sea's business for 2010." *Id.* ¶ 94.

As discussed, Defendants were under no obligation to release financials for not yet completed, upcoming fiscal quarters. What is more, Defendants made significant qualifications as to all statements regarding K-Sea's financial health. They stated "[n]otwithstanding the current environment, we remain very optimistic," about K-Sea's future; "we believe K-Sea will emerge *from this period* in yet a stronger industry position, poised to capitalize on new industry opportunities"; "the demand for single hull tank barges is particularly impacted by market slowdowns"; "we believe 2009 will be a significant transition year." Am. Compl. ¶ 89 (emphasis added). Defendants explicitly outlined their corporate strategy, "[o]ur optimism about the intermediate to long term derives from the belief that when the economic growth resumes in the US, the supply of tank barges in the size in which we concentrate and hold the leading position will have been reduced to a point that stronger utilization and rates will be realized by K-Sea." *Id.* Plaintiffs were warned that K-Sea's "current environment" was difficult, and that the economic slowdown was impacting K-Sea's business. *Id.* Plaintiffs were then told the basis for

any optimism was predicated on an economic turnaround. *Id.* Plaintiffs were aware of the risks

when investing in K-Sea. The economy failed to improve and K-Sea's business did not improve.

Plaintiffs cannot now claim they were misled. Plaintiffs' claims relating to K-Sea's

announcement of its fourth quarter 2009 fiscal year are dismissed with prejudice.

### 5.   August 7, 2009 Public Offering and 424B5 Prospectus Supplement

On August 7, 2009, K-Sea made its public offering and filed a Form 424B6 prospectus

supplement, *id.* ¶ 102, which read:

> We plan to use approximately $47 million of the net proceeds from
> this offering to repay indebtedness under our revolving credit
> facility and the remainder to make construction progress payments
> in connection with our vessel new building program.
>
> Any decrease in demand for tank vessel capacity or decrease in
> charter rates could adversely affect our business, financial
> condition and results of operations.
>
> The remaining 31% (except for one [phased out vessel]) will be in
> compliance with OPA 90 until January 2015. The capacity of
> certain of our single-hull vessels has already been effectively
> replaced by double-hull vessels recently placed into service,
> although we may continue to operate those single-hull vessels until
> their phase-out date.

*Id.* ¶ 100.

Plaintiffs argue that since "[t]he Company failed to disclose that the money raised in the

Secondary Offering would not be enough to ensure the Company's continued compliance with

its financial covenants[,] . . .. failed to disclose that customer preferences and general market

conditions had already drastically affected shipping and utilization rates of single-hull vessels[,] .

. . [and] Defendants knew that they would not be able to continue to operate the single-hull

vessels up to 2015 in light of the accelerated phase-out of single-hull vessel usage by

governments, international organizations and the Company's customers" the supplement was materially misleading. *Id*. 101.

Plaintiffs argue they were entitled to a fuller financial picture of K-Sea's current and future fiscal health before the secondary offering. "The securities laws do not require a defendant to 'provide the public with all material information." *Winer Family Trust v. Queen*, 503 F.3d 319, 329 (3d Cir. 2007) (internal quotation omitted). Upon examination of the statements actually alleged in the 424B 5 Prospectus Supplement, this Court does not find them to be materially misleading. First, Plaintiffs have not shown K-Sea's intention to use the monies raised by the secondary offering to repay indebtedness and to make progress payments was false. Second, the announcement that any decrease in demand would adversely affect K-Sea's business would help to warn investors of a potential decline in business. Finally, K-Sea's contention that it would be in compliance with OPA until 2015 was in fact true. The entirely true disclosures did not give rise to an obligation to provide a fuller financial picture.

Plaintiffs next contend Defendants "also failed to disclose that the Company was hemorrhaging cash because the continued operation of single-hull vessels cost more to operate than the revenues they generated, nor did the prospectus supplement make any mention of the Company's impending lease termination at its Norfolk, Virginia water treatment facility and K-Sea's need to overpay for the purchase of the facility by $1.7 million" *Id*. ¶ 102.

Defendants made true statements about their single-hull vessels – that they were in compliance with the OPA and that they had replaced their single-hull vessels with their double-hull fleet. They further contended they intended to use their single-hull vessels where they could until their phase out date. In fact, K-Sea had contracted some of its single-hull vessels until 2014

and K-Sea was using its single hulls at its water treatment facility. Ex. G. These true disclosures did not give rise to an obligation to disclose that the single-hull fleet was unprofitable.

Finally, this Court finds Defendants did not overstate their balance sheet by failing to warn investors of its impending lease termination at its Norfolk, Virginia water treatment facility and K-Sea's need to overpay for the purchase of the facility by $1.7 million. K-Sea knew, as early as 2005 when it leased the Norfolk facility, that its purchase price in 2010 would be $4.2 million. Am. Compl. ¶ 72. K-Sea disclosed the lease terms at that time in its annual filings. *See e.g.* Ex. I (2008 10-K). K-Sea eventually purchased the facility in the second quarter of 2010. *Id.* KSea disclosed the impairment charge when it announced its results for that same quarter on January 28, 2010. *Id.* ¶ 123. K-Sea adequately informed investors about the purchase and was not under a duty to disclose the purchase before K-Sea bought the facility.

Claims relating to the 424B5 Prospectus Supplement are dismissed with prejudice.

### 6. September 14, 2009 10-K and Deferral of Maintenance Expense Recognition

On September 14, 2009, K-Sea filed a Form 10-K with the SEC that reiterated its previously announced 2009 fourth quarter fiscal year results which was signed by CEO Casey, CFO Gill, and Directors Dowling, Abbate, Alperin, Friedman, and Salerno. Am. Compl. ¶ 109. The 10-K form stated:

> Existing single-hull, double-sided and double-bottomed tank vessels are to be phased out of service at varying times based on their tonnage and age, with all such vessels being phased out by January 2015. As of September 1, 2009, we had 17 single-hulled tank vessels that will be precluded from transporting petroleum products as of January 1, 2015.

*Id.* ¶ 107.

Plaintiffs contend the challenged statements were misleading since: customers were deferring and foregoing contract renewals on single-hull vessels, K-Sea did not believe single-hull vessels had much useful life beyond 2011, K-Sea was valuing its single-hull vessels at inflated amounts in light of their rapidly declining useful life and low retail value, K-Sea was improperly accounting for recognized maintenance expenses as capitalized expenses, K-Sea's financial troubles were not disclosed because the Defendants did not want the negative news to have an adverse impact on the August 7, 2009 secondary offering, K-Sea's financial troubles would lead to suspension in the shareholders distribution-per unit, and K-Sea would soon be in default of its financial covenants. *Id*. ¶¶ 108.

To repeat, K-Sea's handling of its declining single-hull fleet was not improper nor misleading. Claims predicated upon K-Sea's supposed disbelief that single-hull vessels had a useful life are dismissed with prejudice.

However, the form also disclosed K-Sea's adherence to the matching principle of accounting requires expenses be matched with revenues. *Id*. ¶ 104. Expenses are recognized not when the work is performed, but when the work or asset is spent while contributing to the revenue. The form stated "[m]ajor renewals and betterments of assets are capitalized and depreciated over the remaining useful lives of the assets. Maintenance and repairs that do not improve or extend the useful lives of the assets are expensed." *Id*. ¶ 105

Plaintiffs argue K-Sea "violated GAAP and its own internal accounting policies by recognizing maintenance expenses as capitalized expenses, and thus deferring the recognition of such expenses in order to decrease operating expenses, inflate net income and assets during the class period." *Id*. ¶¶ 105-106. The Confidential Witnesses testified to alarm over the maintenance repair accounting. CW 1 stated K-Sea "capitalized scheduled dry docks and depreciated those

costs over three years which increased EBITCA, spreading costs over the year." Am. Compl. ¶ 65. CW 4 questioned the legitimacy of this practice. *Id.* ¶ 70. Through CW 4 and 5 the Amended Complaint also suggests that K-Sea may have miscoded or mislabelled certain repairs as drydocking. Am. Compl. ¶¶ 70, 75.

Defendants argue that K-Sea disclosed that it "capitalizes drydocking expenditures and amortizes the costs over three years in multiple places in every quarterly and annual SEC filing" and that it has disclosed the amount of its drydocking expenditures. Def. Mot. to Dismiss, 18. However, simply because K-Sea is forthright about its practices does not mean they are exempt from review. Nevertheless, Defendants persuasively argue Plaintiffs' Amended Complaint fails to plead the specifics of this charge with particularity.

"[W]here plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices . . . plaintiffs [must] state what the unreasonable practise were and how they distorted the disclosed data." *Burlington*, 114 F. 3d at 1417-18; *see also In re Mileston Scientific Sec. Litig.*, 103 F. Supp. 2d 425, 473 (D.N.J. 2000) (Plaintiff does not "approximate, much more state with particularity, the amount by which revenues were overstated as a result of the alleged improper revenue recognition.") Defendants argue the Amended Complaint "does not identify what expenses were improperly coded, why the coding was improper, which statements were false as a result of this purported accounting issue, the amount by which those statements were false, who made the purportedly false statements, or why the person who made the statements knew about the accounting issue and that the statements were false. One of the witnesses credited with providing information on this issue does not even state that anything was miscoded, only that 'large bills coded to dry dock' (which is normal since

drydocking is expensive)." Mot. to Dismiss, 28. Plaintiffs do not reply to these criticisms in their opposition.

These claims are dismissed without prejudice.

### 6. October 28, 2010 Operating Results and Related Conference Call

On October 28, 2010, K-Sea issued a press release announcing its operating results for its third quarter of fiscal year 2009 and conducted a related conference call to discuss the results with market analysts. Ex. F; Ex G. CEO Casey, CFO Gill, and Director Dowling represented K-Sea on the call. Ex. G.

Plaintiffs challenge the following statements in the release:

> The Company reported an operating loss of $1.3 million, including an asset impairment charge of $5.9 million. Operating income, before asset impairment charges, was $4.6 million, a decrease of $5.3 million, or 54%, compared to the first fiscal quarter ended September 30, 2008.

> The Company also announced that its distribution to unitholders for the first fiscal quarter will be $0.45 per unit, or $1.80 per unit annualized, compared to the previous distribution of $0.77 per unit. Am. Compl. ¶ 110.

CEO Casey stated:

> We believe that the single-hulls, which are mandated to be phased out by 2014, are now commercially obsolete as customers are unwilling to accept this equipment, in light of the availability of double-hulled vessels.

> Given the current and expected market conditions, we expect to phase out our single-hulls in the near-term. Our depreciation and amortization expense in the first fiscal quarter includes an asset impairment charge of $5.9 million in respect of our single-hull equipment." *Id.*

In the related conference call CEO Gill declared:

> The fiscal 2010 first quarter suffered an operating loss of $1.3 million. This was a direct result of a $5.9 million asset

> impairment charge on certain of our single-hull vessels, which was recorded in depreciation and amortization. *Id.* ¶ 111.

CEO Casey stated:

> Our fleet experienced an unanticipated decrease in demand for our services, primarily on our single-hull tonnage. *Id.* ¶ 112.

Plaintiffs contend these statements were materially false and misleading because CEO Casey "knew or recklessly disregarded," that major oil companies would not use single hull vessels and that the single hull ships had to be removed from service by 2010. *Id.* ¶ 114. Plaintiffs argue that CEO Casey's statement that "our fleet experienced an unanticipated decrease in demand for our services" was materially misleading because decrease "was far from unexpected." *Id.*

This Court finds the statements made by Defendants to be accurate. Plaintiffs have not explained why true disclosure of K-Sea's operating income, distribution to unitholders, or impairment charges would be materially misleading. And as earlier discussed, Defendants' timing of its single-hull fleet asset impairment charge was justified. Finally, CEO Casey's statement about "unexpected decrease" is not false. Accepting that CEO Casey knew about a decrease as early as 2008 due to market decline: a persistent economic downturn could have been unexpected. Plaintiffs' claims arising from the announcement of K-Sea's first quarter fiscal year 2010 were not materially misleading and are dismissed with prejudice.

### 7. December 9 2009 Wells Fargo Symposium

On December 9, 2009, CEO Casey and CFO Gill made presentations about the Company and participated in a Q & A session at the Wells Fargo analyst symposium. *Id.* ¶ 117. Plaintiffs challenge the following statements.

CEO Casey stated:

> Utilization has been very consistent over the years. We purchased K-Sea in 1999, drove the utilization above 80%, and we've been able to main [sic] consistent utilization at around 85%. In fact in the most recent quarter or utilization was at 86%. *Id.* ¶ 118.

CFO Gill stated:

> With that said,[referring to the fact K-Sea was in negotiation with bank lenders about their financing agreements] as shown on the slide, we are in a good liquidity position. The cash availability from our bank – from our bank revolver and other loan agreements is approximately 95 million, more than enough to cover our required progress payments." *Id.* ¶ 119

In relation to whether to suspend the quarter's distribution CEO Casey and CFO Gill responded:

> Casey: Well, we are renegotiating because we have one covenant that we think that we'll breach eventually . . . . We could pay the distribution right now, if we do breach it. But I think that's – we're not looking to be in a situation for breaching the covenant, so we're working very hard with the banks right now to . . .

> Gill: We think by the end of the year, we're going to have a negotiation with the bank that'll fix all the issues. *Id.* ¶ 120.

Plaintiffs list the reasons CEO Casey and Gills statements were misleading as:

> (a) the Company's utilization rate was not consistent but rather declining rapidly and the Company was masking this decline with short-term contracts;
>
> (b) the Company was not in a "good liquidity position" and did not have sufficient cash on hand;
>
> (c) the Company's balance sheet was not extremely strong as it had overstated the value of its single hull vessels;
>
> (d) K-Sea's reduced distribution was still too high for the Company to meet;
>
> (e) K-Sea would have to suspend its distribution to meet debt obligations; and
>
> (f) due to lack of lease renewal options, the Company would have to overpay by $1.7 million to purchase its Norfolk water treatment facility.

Am. Compl. ¶ 120.

Despite Plaintiffs' contentions, K-Sea maintained a high utilization rate and had fully disclosed to investors at the same Q & A that "[w]hile our rates in utilizations were acceptable [within the range of 80%] they masked what was really happening. During the quarter we employed about 10% of our fleet – 10% of our capacity, mostly our single-hulls to service our oily water processing plant in Norfolk, Virginia." Ex. H. As such, its disclosure of its true utilization rates was not misleading. Next, Plaintiffs have not pled that K-Sea defaulted on its obligations. K-Sea's liquidity and balance sheet may have been a strong point for the company. Investors at that time would have known about the decrease in business disclosed in its October 28, 2009 announcement of first quarter fiscal year 2010 results. Defendants statements regarding its balance sheet were not false, and investors could have made reasonable decisions about whether to invest in a company that had posted declines. Statements relating to K-Sea's fiscal health were not misleading. Finally, this Court has already discussed the Norfolk water treatment facility and has found K-Sea did not materially misrepresent its lease options. Plaintiffs' claims relating to the Well Fargo Q & A are dismissed with prejudice.

## II.     Section 20(a)

Section 20(a) creates liability for "controlling persons" in a corporation, 15 U.S.C. § 78t(a), imposes joint and several liability upon anyone who "controls a person liable under any provision of" the Exchange Act. To maintain a claim under § 20(a), the plaintiffs must establish (1) an underlying violation by a controlled person or entity, (2) that the defendants are controlling persons, and that they were "in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 885 (3d. Cir. 1975).

Plaintiffs Section 20(a) claims fail because they have failed to plead an underlying violation of Section 10(b) of the Exchange Act.

## III.    Director Defendants

The Director Defendants filed a motion to dismiss alleging Plaintiffs' allegations relating to the K-Sea's Board of Directors were insufficient under the PSLRA. ECF No. 43. Director Defendants allege Plaintiffs only provide one statement made by a Director Defendant with particularity, and that that statement was not actionable. Dir. Def. Mot. to Dismiss, 11. Director Defendants also argue that as to the remaining allegations against them, Plaintiffs failed to plead Director Defendants had the requisite state of mind of scienter to satisfy the requirements of the PSLRA. *Id.* 16. Director Defendants are correct.

Plaintiffs only attribute one specific statement to a Director Defendant. They allege Director Defendant Dowling stated in May of 2009, that "we think the long-term future of the company is still very bright and promising." Am. Compl. ¶ 78. As discussed, this statement is a general expression of corporate optimism understood by reasonable consumers as "puffery." *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) (overruled in part on other grounds, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ("vague and general statements of optimism 'constitute no more than "puffery" and are understood by reasonable consumers as such'") (quoting *Burlington* Coat, 114 F.3d at 1428 n. 14).

Plaintiffs also allege that because the Director Defendants signed "[t]he false and misleading 10-K filed with the SEC on September 14, 2009" the Director Defendants acted with scienter. Am. Compl. ¶ 41. As explained, under the PSLRA a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2). A plaintiff must plead the defendant, "acted with

scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 55 U.S. 308, 319 (2007). A strong inference exists "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw." *Id.* at 324. In *In re Cendant Corp. Litigation*, 76 F. Supp. 2d 539 (D.N.J. 1999) this Court concluded "[a]llegations that a director or officer signed public disclosures and/or was involved in the company's daily operations, standing alone, will not satisfy the pleading requirements of the PSLRA or Rule 9(b)." *Id.* This Court finds so again. Simply showing a defendant signed a 10-K form does not meet the pleading requirements of the PSLRA.

Finally, Plaintiffs' attempt to bootstrap all of their allegations to the Board of Directors cannot be justified under the PSLRA. Plaintiffs rely upon group pleading to implicate the Director Defendants explaining, "because of their positions of control and authority as . . . directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period." Am. Compl. ¶ 41. Plaintiffs urge this court to view all "Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information in the Company's filings, press releases and other publications . . . are . . . collective actions." *Id.* ¶ 39. The Third Circuit has rejected group pleading in private securities actions stating "the group pleading doctrine is no longer viable . . . after the enactment of the PSLRA." *Winer Family Trust*, 503 F.3d at 335. The PSLRA "requires plaintiffs to specify the role of each defendant, demonstrating each defendant's involvement in misstatements and omissions." *Id.* at 335-336. Because Plaintiffs have failed to detail specific actions of the individual board members, Plaintiffs have not sufficiently pled under the PSLRA.

With the exception of the statement by Director Defendant Dowling, Plaintiffs' do not particularize their accusations against the Director Defendants. The Board of Directors' motion to dismiss is granted with prejudice.

## IV.   Director Friedman

Because the claims against Director Friedman fail under the PSLRA and are dismissed with prejudice, this Court need not reach the substance of such.

## V.   Conclusion

Defendants' motion to dismiss is GRANTED and Plaintiffs' claims are dismissed in part with prejudice, in part without prejudice. The Director Defendants' motion to dismiss is GRANTED and Plaintiffs' claims against them are dismissed with prejudice.

**s/ William H. Walls**
United States Senior District Judge